**David P. Rossmiller, OSB No. 983395**
Email: drossmiller@chartwelllaw.com
**Elissa M. Boyd, OSB No. 111679**
Email: eboyd@chartwelllaw.com
**Sean W. Carney, OSB No. 054550**
Email: scarney@chartwelllaw.com
The Chartwell Law Offices, LLP
1050 SW 6th Avenue, Suite 1100
Portland, OR 97204
Telephone:     (503) 886-8108
Facsimile:     (503) 961-7864

*Attorneys for Plaintiff State Farm Fire
and Casualty Company*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois Company,<br><br>              Plaintiff,<br><br>vs.<br><br>CEDAR AVENUE, LLC, an Oregon Limited Liability Company, and WILLIAM FORD, JR., individually,<br><br>              Defendants. | Case No.: 3:23-cv-00634<br><br>**PLAINTIFF STATE FARM FIRE AND CASUALTY COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT – DUTY TO DEFEND**<br><br>**(ORAL ARGUMENT REQUESTED)** |

*/ / /*

**TABLE OF CONTENTS**

TABLE OF CONTENTS....................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................v

LR 7-1(a) CERTIFICATION ..........................................................................................1

MOTION..........................................................................................................................1

MEMORANDUM IN SUPPORT....................................................................................2

I.    Introduction...........................................................................................................2

II.   Background............................................................................................................3

    A.   The State Farm Policies. .............................................................................3

    B.   The allegations of the Complaint in the Underlying Lawsuit.....................3

        1.    Ford's alleged willful and malicious racial slurs. .....................................4

        2.    Ford's alleged displays of nakedness to the Davidsons and alleged related coerciveness. ..................................................................................................5

        3.    The Davidsons' vacating of their residence at the duplex, allegedly to escape from Ford's intentional conduct. ........................................................7

        4.    The Davidsons' alleged damages from Ford's conduct...........................8

        5.    The claims against Ford and Cedar Avenue. ............................................9

            a.    Claim No. 1 – Race Discrimination under 42 USC §3604. ...................9

            b.    Claim No. 2 – Race Discrimination under ORS 659 A.421. ...............9

            c.    Claim No. 3 – Sex Discrimination under 42 USC §3604. ....................9

            d.    Claim No. 4 – Sex Discrimination under ORS 659 A.421. ................10

            e.    Claim No. 5 – Landlord Retaliation under ORS 90.385. ....................10

            f.    Claim No. 6 – Battery of Haylee Davidson and of Eric Davidson. ....10

            g.    Claim No. 7 – Intentional Infliction of Emotion Distress...................10

            h.    Claim No. 8 – Negligence. ..................................................................11

            i.    Claim No. 9 – Intentional Interference with Economic Relations. ......11

ANALYSIS......................................................................................................................11

I.    Discussion............................................................................................................11

    A.   Standards for summary judgment. ............................................................11

    B.   Standards governing insurers' duties to defend.........................................12

    C.   Ford's intent is imputed to Cedar Avenue. ...............................................12

D. The coverage grant is not triggered in the Rental Dwelling Policy nor is the coverage grant triggered in the Umbrella Policy for any "bodily injury" alleged in the Underlying Complaint. Cedar Avenue is not an insured under the Umbrella Policy. ..............................15

   1. The Rental Dwelling Policy's Coverage Grant is not triggered. ............................15

      a. The Race and Sex Discrimination claims do not constitute an "occurrence."......17

      b. The Landlord Retaliation claim, under ORS 90.385, does not allege an "occurrence." ...................................................................................................19

      c. The two counts of the Battery claim do not allege an "occurrence."...................21

      d. The Intentional Infliction of Emotional Distress claim does not allege an "occurrence." ...................................................................................................22

      e. The Negligence claim does not allege an "occurrence."......................................23

      f. The Intentional Interference with Economic Relations claim does not allege an "occurrence." ...................................................................................................24

   2. There is no "bodily injury" or "property damage" "loss" to trigger any duty to defend regarding the Umbrella Policy for Ford, and Cedar Avenue is not an insured on the Umbrella Policy. ......................................................................................................25

      a. Cedar Avenue is not an insured on the Umbrella Policy. ....................................25

      b. The coverage grant of the Umbrella Policy is not triggered for any "bodily injury" or "property damage" "loss."........................................................................26

E. Exclusions in both policies completely preclude a duty to defend both Ford and Cedar Avenue. ..............................................................................................................................27

   1. Exclusions in the Rental Dwelling Policy completely preclude coverage. .............27

      a. The Expected or Intended Injury Exclusion precludes the duty to defend under the Rental Dwelling Policy. ........................................................................................27

      b. The Willful and Malicious Acts Exclusion precludes the duty to defend either insured under the Rental Dwelling Policy. ..................................................................29

      c. The exclusion in the Rental Dwelling Policy for "personal injury" caused by a violation of penal law or ordinance precludes coverage for all allegations of Sex Discrimination, Race Discrimination and Landlord Retaliation...................................31

   2. Exclusions in the Umbrella Policy preclude a duty to defend Ford – the only insured under the Umbrella Policy. ..................................................................................32

      a. The Harassment, Molestation or Discrimination Exclusion precludes the duty to defend regarding Ford....................................................................................................32

      b. The Business Pursuits Exclusion precludes the duty to defend regarding Ford. .32

      c. The Specific Intent to Cause Harm Exclusion and the Expected or Intended Injury/Willful and Malicious Acts Exclusions, together, preclude the duty to defend Ford. 34

II.    Conclusion. ..............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Albertson's, Inc. v. Great Southwest Fire Ins. Co.*,
   83 Or. App. 527 (1987) .......................................................................... 13

*Allstate Ins. Co. v. Freeman*,
   432 Mich. 656 (1989) ............................................................................ 28

*Am. Med. Response Northwest, Inc. v. Ace Am. Ins. Co.*,
   31 F. Supp. 3d 1087 (D. Or. 2014) ....................................................... 13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................... 11

*California Union. Ins. Co. v. American Diversified Sav. Bank*,
   948 F.2d 556 (1991) .............................................................................. 14

*Cortez v. Nacco Material Handling Grp., Inc.*,
   356 Or. 254, 274 (2014) ........................................................................ 13

*Cunningham & Walsh Inc. v. Atlantic Mutual Ins.*,
   88 Or. App. 251 (1987), *rev. den.* 305 Or. 102 (1988) ........................ 24

*Drake v. Mut. of Enumclaw Ins. Co.*,
   167 Or. App. 475 (2000) ....................................................................... 22

*Elk Creek Mgmt. Co. v. Gilbert*,
   353 Or. 565 (2013) ................................................................................ 19

*Estate of Schuch v. State Farm Fire & Cas. Co.*,
   552 F. Supp. 3d 1154 (2021) ................................................................. 30

*Estate of Schuch v. State Farm Fire & Cas. Co.*,
   552 F. Supp. 3d 1154 (D. Or. 2021) ..................................................... 16

*Falkenstein's Meat Co. v. Md. Cas. Co.*,
   91 Or. App. 276 (1988) ......................................................................... 24

*Ferguson v. Birmingham Fire Ins. Co.*,
   254 Or. 496 (1969) ................................................................................ 22

*Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*,
   360 Or. 341 (2016) ................................................................................ 12

*Groshong v. Mut. of Enumclaw Ins. Co.*,
   143 Or. App. 450 (1996) ....................................................................... 19

*Hall v. State Farm Fire & Cas. Co.*,
   109 Wash. App. 614 (2001) ................................................................... 30

*Johnson v. Allstate Ins. Co.*,
   1997 ME 3, 687 A2d 642 (Me.) .............................................................. 28

*Kabil Developments Corp. v. Mingot*,
   279 Or. 151 (1977) ................................................................................ 12

*Kirk v. Mut. of Enumclaw Ins.*,
   2019 U.S. Dist. LEXIS 127704 (D. Or.) ................................................. 28

*Knight v. Durbin*,
2019 U.S. Dist. LEXIS 115445 (D. Or.)..................................................................... 21

*L&D of Or. v. Am. States Inc. Co.*,
171 Or. App. 17 (2000) ................................................................................................ 22

*L&D of Or. v. Am. States Ins. Co.*,
171 Or. App. 17 (2000) ................................................................................................ 16

*Ledford v. Gutoski*,
319 Or. 397 (1994)................................................................................................. 12, 27

*McLeod v. Tecorp Int'l, Ltd.*,
117 Or. App. 499 (1992) .............................................................................................. 13

*Minnesota Bond, Ltd. v. St. Paul Mercury Ins. Co.*,
72 Or. App. 187 (1985) *reversed on other grounds*, 300 Or. 85 (1985)..................... 14

*Mullen v. Meredith Corp.*,
271 Or. App. 698 (2015)............................................................................................... 22

*Mutual of Encumclaw Ins. Co. v. Gutman*,
172 Or. App. 528 (2001) .............................................................................................. 16

*Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp.*,
220 Or.App. 560 (2008).................................................................................................. 3

*North Clackamas Sch. Dist. v. Or. Sch. Bds. Ass'n Prop. & Cas. Trust*,
164 Or. App. 339 (1999) .............................................................................................. 13

*Pemco Mut. Ins. Co. v. Foley*,
555 F. Supp. 3d 1028 (2021) ....................................................................................... 28

*Ristine v. Hartford Ins. Co.*,
195 Or. App. 226 (2004)............................................................................... 28, 29, 32

*Sch. Dist. v. Mission Ins. Co.*,
58 Or. App. 692 (1982) .......................................................................................... 17, 18

*Springer v. Powder Power Tool Corp.*,
220 Or. 102 (1960)........................................................................................................ 12

*Thoele v. Aetna Cas. & Sur.*,
39 F.3d 724 (7th Cir. 1994) ......................................................................................... 28

*Wakeman v. Eagle W. Ins. Co.*,
2022 U.S. Dist. LEXIS 155918 (D. Or.)...................................................................... 29

*Western Fire Insurance Co. v. Wallis*,
289 Or. 303 (1980)........................................................................................................ 29

*Wigton v. State Farm Fire And Cas. Co.*, 2022 U.S. App. LEXIS 35273 ................... 30

**Statutes**

42 U.S.C. 3604 .............................................................................................................. 17

42 U.S.C. 3605 .............................................................................................................. 17

ORS 654.062.................................................................................................................. 24

ORS 659A.421 .............................................................................................................. 17

ORS 90.385.................................................................................................................... 19

**Rules**

Fed. R. Civ. P. 56..................................................................................................... 1

**Treatises**

The Restatement (First), Contracts, § 230, p. 310 ....................................................... 12

Counsel for plaintiff State Farm Fire and Casualty Company ("State Farm") conferred on August 30, 2023 with counsel for defendants Cedar Avenue, LLC ("Cedar Avenue") and William Ford, Jr. ("Ford"), concerning the issues raised in this motion, but the Parties were unable to resolve the dispute.

## MOTION

Pursuant to Fed. R. Civ. P. 56, State Farm moves the Court for partial summary judgment on the following questions of law:

1. That State Farm does not have a duty to defend either Ford or Cedar Avenue in the Underlying Lawsuit under the Rental Dwelling Policy and can immediately withdraw from the defense:

   a. Because there is no "occurrence" alleged in the Underlying Complaint as is required to trigger the Rental Dwelling Policy;

   b. Because the Rental Dwelling Policy's Expected or Intended Injury Exclusion and Willful and Malicious Acts Exclusion apply to preclude coverage for all claimed damages; and

   c. Because there is no coverage under the Rental Dwelling Policy for any "personal injury" caused by violation of a penal law or ordinance due to Exclusion f.

2. That State Farm does not have a duty to defend either Ford or Cedar Avenue in the Underlying Lawsuit under the Umbrella Policy:

   a. Because Cedar Avenue is not an insured on the Umbrella Policy;

   b. Because there is no "loss" related to "bodily injury" or "property damage" alleged in the Underlying Lawsuit and there is no "bodily injury" or "property damage"

alleged in the Underlying Lawsuit;

    c.    Because the Harassment, Molestation or Discrimination Exclusion and the Business Pursuits Exclusion apply;

    d.    Because the Expected or Intended Injury Exclusion and the Willful and Malicious Act Exclusion apply to preclude coverage for "bodily injury" and "property damage"; and

    e.    Because the Exclusion for "'personal injury' when the 'insured' acts with specific intent to cause any harm" applies.

This Motion is supported by Plaintiff's Memorandum below, the Declaration Of David P. Rossmiller In Support Of Plaintiff State Farm Fire And Casualty Company's Motion For Partial Summary Judgment – Duty To Defend ("Decl. of Rossmiller") and the materials on file with the Court.

## MEMORANDUM IN SUPPORT

### I.    Introduction.

State Farm's Policies do not provide insurance coverage for the alleged willful and malicious actions of the defendants in the case underlying this insurance coverage action. The Complaint in the Underlying Lawsuit alleges that "Defendant William Ford regularly made racist insults toward Plaintiff Eric Davidson, exposed his genitals to both Plaintiffs, and used his position as Plaintiffs' landlord to threaten and coerce them. These actions included coercing both Plaintiffs to rub moonshine (alcohol) onto his naked back and buttocks." Decl. of Rossmiller, ¶ 2, Exhibit 1 ("Underlying Complaint"), p. 2. These allegations are not describing accidental acts which trigger "occurrence"-based or "loss"-based insurance policies like those issued by State Farm. Instead, they are allegations of intentional harassment and State Farm should not be forced to defend Ford

or Cedar Avenue – a company solely owned by Ford – for Ford's intentional wrongdoing.

## II.     Background.

The duty to defend is determined by comparing the allegations against Ford and Cedar Avenue in the Underlying Complaint to the terms of the State Farm policies. *Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp.*, 220 Or. App. 560, 564 (2008).

### A.     The State Farm Policies.

Cedar Avenue, LLC is the named insured on State Farm Rental Dwelling Policy No. 97-CG-V506-7. Decl. of Rossmiller, ¶ 3, Exhibit 2 ("Rental Dwelling Policy"), p. 1. The term "insured," as defined in the Rental Dwelling Policy, includes in relevant part, "the organization trustees, directors or governors or stockholder thereof while acting within the scope of their duties." The Underlying Complaint alleges that Ford ". . . is and at all relevant times was the member-manager of Defendant Cedar Avenue LLC." (Underlying Complaint, ¶ 8).

William Ford, Jr. is the named insured on State Farm Personal Liability Umbrella Policy No. 37-B5-H087-4. Decl. of Rossmiller, ¶ 4, Exhibit 3 ("Umbrella Policy"), p. 1. Cedar Avenue is not a named insured or otherwise an insured on the Umbrella Policy. *Id.*

### B.     The allegations of the Complaint in the Underlying Lawsuit.

The Underlying Lawsuit was filed by Eric and Haylee Rose Davidson (the "Davidsons") against Ford and Cedar Avenue. The Underlying Complaint alleges that the Davidsons, a married couple, were tenants at a Cedar Avenue-owned duplex in Milwaukie, Oregon from approximately December 5, 2021 until approximately August 4, 2022 pursuant to a written rental agreement. (Underlying Complaint, ¶¶ 6-7, 13). Ford is alleged to be "**the** member-manager" of Cedar Avenue, LLC. (*Id.* at ¶ 8) (emphasis added).

According to the Underlying Complaint, Haylee Davidson was employed by a business as a caregiver for Annie Heberts, the Davidsons' neighbor in the other unit of the duplex but,

ultimately, Ford's actions allegedly caused the employer to end its business-client relationship with the neighbor, resulting in the termination of Ms. Davidson's employment. (*Id.* at ¶¶ 18, 28-29). Ford's improper actions, as alleged in the Underlying Complaint, consisted of the following:

### 1. Ford's alleged willful and malicious racial slurs.

Ford, who is alleged to be a white male, allegedly "regularly made racist insults toward . . . Eric Davidson," who is alleged to be of Asian descent "and presents as such." (Underlying Complaint, Introduction and ¶¶ 10, 12). For example, Eric Davidson allegedly was using a rental home key to make copies when Ford, on December 6, 2021, asked Mr. Davidson to return the key. (*Id.* at ¶14). Mr. Davidson allegedly told Ford over the phone that neither he nor Ms. Davidson could return the key immediately because they were working, and Ford allegedly responded by saying that he always has problems with "you people" when it comes to business and said that "[N-word]s[1]" like Mr. Davidson "don't know how to conduct proper business." (*Id.*). This incident allegedly took place one day after the Davidsons began their occupancy of the duplex.

Also, on or before December 10, 2021, Ford allegedly demanded that Ms. Davidson pick up a pie for Ford at a grocery store, but the store did not have that type of pie, so Ms. Davidson was unable to get the pie. (*Id.* at ¶ 15).[2] In response, Ford allegedly accused Ms. Davidson of lying and told her to "get out of the Rental Home." (*Id.*). Ford allegedly sent a text message to Mr. Davidson on December 10, 2021 stating that picking up a pie for Ford was one reason the Davidsons' rent was so low and threatened to raise the rent from $1,250 a month to $1,300.

---

[1] The bracketed word here and the bracketed words below are as written in the Underlying Complaint.

[2] This allegation in paragraph 15 of the Underlying Complaint contains a reference to a "Ms. Guiterres" being unable to pick up the type of pie that Ford had demanded from Haylee Davidson, and states that when Ms. Davidson informed Ford about the pie, Ford "accused her of lying and told her to get out of the Rental Home." This Motion assumes that Ms. Guiterres is Ms. Davidson.

(*Id.* ¶ 16). On the same day, Ford allegedly had a follow-up phone call with Mr. Davidson and called Mr. Davidson "a dirty lying [N-word]," said that Mr. Davidson "was nothing but an immigrant," threatened to call the Department of Immigration to have Mr. Davidson deported from the United States and said that the Davidsons must get off Ford's property or Ford would forcibly remove them. (*Id.* ¶ 17).

On or about March 30, 2022, according to the Underlying Complaint, Mr. Davidson informed Ford by phone that he would be late on rent due to a loss of wages because of Covid-19, and in response, Ford allegedly "stated that Mr. Davidson is nothing but a liar and never holds to his word," and that "white people never have these problems." (*Id.* ¶ 22). Ford allegedly also said that he "only ever has problems with rent being late from [N-word] and [S-word used to disparage Spanish-speaking individuals]." (*Id.*). Ford allegedly further stated that "'you people' are all the same" and "that Mr. Davidson should go back to his country if he can't afford the rent." (*Id.*). Ford allegedly also said that he would evict Mr. Davidson if he could not afford to pay rent, but then allowed the Davidsons to pay partial rent for April at the beginning of the month and the remainder on April 10, 2022. (*Id.* at ¶¶ 22-23).

On or about May 18, 2022, the Underlying Complaint alleges, Ford requested that Mr. Davidson bring Ford replacement filters for an air filtration device that Ford had rented from Mr. Davidson earlier that month. Mr. Davidson allegedly told Ford that he would give him a call and set up a time to drop off the filters, but Ford allegedly became upset and called Mr. Davidson "a lying [N-word] piece of shit" and told Mr. Davidson that he owed Ford clean air and needed to bring the filters immediately. (*Id.* at ¶ 26).

### 2. Ford's alleged displays of nakedness to the Davidsons and alleged related coerciveness.

As mentioned above, Ford allegedly "exposed his genitals" to both Haylee Davidson and

Eric Davidson, and allegedly used his position as landlord to threaten and coerce the Davidsons. For example, in March 2022, Haylee Davidson allegedly reported to work as neighbor Annie Heberts' caregiver and, upon entering Heberts' residence next door in the duplex, found Ford sleeping naked on an air mattress in the living room. Ms. Davidson told Ford to put his clothes on, according to the Underlying Complaint, but instead he put his clothes in Heberts' oven. It is alleged that Ms. Davidson told Ford that putting clothes in the oven was unsafe, but Ford responded by telling Ms. Davidson "to mind her own business and make his coffee." (Underlying Complaint, ¶¶ 18-19).

Ms. Davidson allegedly did make the coffee for Ford, and afterward Ford allegedly handed her a spray bottle and asked her to follow him into the bathroom, where he allegedly told her to open a package of microfiber wipes, spray the substance in the bottle onto the wipes "and rub the substance onto his naked back and buttocks." (*Id.* at ¶ 20). Ms. Davidson allegedly stated that she was uncomfortable with this, but Ford replied that "she has cheap rent for a reason," and she "proceeded to rub him down as requested" in "a state of duress" and out of "fear of retribution." (*Id.*). Ms. Davidson allegedly later was told by Ms. Heberts that the substance she had wiped onto Ford's body was a type of "moonshine." (*Id.* at ¶ 21).

On April 10, 2022, the Underlying Complaint alleges, Mr. Davidson visited Ford's home to pay rent and Ford "walked around his home naked and asked Mr. Davidson to rub moonshine onto Mr. Ford's back and buttocks." (*Id.* at ¶ 24). It is alleged that Mr. Davidson refused to do so, and Ford responded by stating that Mr. Davidson "was made for that kind of work." (*Id.*). Mr. Davidson then allegedly said that he was leaving, and Ford allegedly stated that he would add $50 to the Davidsons' rent the next month. (*Id.*).

In early June 2022, Mr. Davidson allegedly was at Ford's home again and it is alleged that

Ford once again asked him to rub moonshine on his naked back and buttocks. Mr. Davidson allegedly complied because of "fear of retribution." (*Id.* at ¶ 27).

On June 29, 2022, the Underlying Complaint alleges, Haylee Davidson reported to work at Heberts' unit and found that Ford was present and again was naked. (*Id.* at ¶ 28). Ms. Davidson allegedly requested that Heberts ask Ford to put his clothes on and Ford "became visibly agitated and did not put on his clothes." (*Id.*). Ms. Davidson allegedly then told Ford that she refused to work if he did not put on his clothes, and in response, Ford allegedly said that Ms. Davidson would be breaching a contract if she did not work and said that he would evict Ms. Davidson "right after she came to her senses and made his 'goddamn coffee.'" (*Id.*). Ford allegedly then sent a text message to Mr. Davidson stating that the text was a 90-day notice of a rent increase for the Davidsons. (*Id.* at ¶ 30).

On the same day, June 29, 2022, the Davidsons' seven-year-old daughter allegedly went to visit Heberts for breakfast, as she frequently did, and as the girl approached Heberts' door she found Ford standing naked in the doorway smoking a cigarette. (*Id.* at ¶ 31). Ford allegedly told the daughter that she was breaking into Heberts' residence and the girl ran back to the Davidsons' residence and told Mr. Davidson that there was a naked stranger in Heberts' doorway, and she was sorry for breaking in and didn't want to go to jail. (*Id.*). Mr. Davidson allegedly then went to confront Ford, who allegedly said that he was threatening Davidson's continued residence in the duplex and said, "you are going to move anyway, I promise you that." (*Id.* at ¶ 32). The Underlying Complaint alleges that the Davidsons then made a police report regarding Ford's naked exposure to their daughter. (*Id.* at ¶ 33).

3.    **The Davidsons' vacating of their residence at the duplex, allegedly to escape from Ford's intentional conduct.**

The Underlying Complaint alleges that after the June 29, 2022 incident where Ford refused

to put on his clothes and told Ms. Davidson that she would be breaching a contract if she left and didn't perform work for Heberts, Ms. Davidson called her employer to report the incident and, in response, Ms. Davidson's employer dropped Heberts as a client, leaving Ms. Davidson without a job. (Underlying Complaint, ¶ 29). Due to Ms. Davidson's loss of her employment, the Underlying Complaint alleges, the Davidsons were unable to make their July 2022 rent payment to Ford, and on August 4, 2022, the Davidsons "vacated the Rental Home to escape Mr. Ford and spent some nights on a relative's couch before finding housing in Ms. Davidson's parents' basement." (*Id.* at ¶ 34-35).

### 4. The Davidsons' alleged damages from Ford's conduct.

The Underlying Complaint alleges that Ms. Davidson was unemployed from June 29, 2022 until at least July 7, 2022 "stemming from Mr. Ford's refusal to wear clothes at Ms. Heberts' unit," and that, therefore, she had a loss of income. (Underlying Complaint, ¶¶ 34, 36). The Underlying Complaint further alleges that, "[a]s a result of Mr. Ford's racist insults to Mr. Davidson, his coercive behavior, his threats regarding Ms. Davidson's housing, his interference with her job, his intimidation of her, Ms. Davidson experienced substantial emotion distress and mental suffering" including "stress, anger, shame, humiliation, inconvenience," as well as "stomachaches, loss of appetite, and sleeplessness, among other things." (*Id.* at ¶ 38). As a result of her depression and anxiety, Ms. Davidson allegedly had to start a regimen of medications to manage her conditions, and the medications allegedly had detrimental side effects including high blood pressure and digestive problems. Ms. Davidson also allegedly suffered loss of consortium "because of Mr. Ford's harm to Mr. Davidson." (*Id.* at ¶¶ 38-39).

It also is alleged that "[a]s a result of Mr. Ford's racist insults to Mr. Davidson, his coercive behavior, and his threats regarding Mr. Davidson's housing," Eric Davidson allegedly also experienced "substantial emotional distress and mental suffering" including "stress, anger, shame,

humiliation, inconvenience," that manifested itself in sleeplessness, as well as a loss of consortium with Ms. Davidson. (*Id.* at ¶ 37).

All of the Davidsons' claims allege vicarious liability against Cedar Avenue for Ford's actions because, as "the member-manager" – an agent or employee of Cedar Avenue – Ford allegedly was acting within the scope of his employment or with actual, implied or apparent authority. (Underlying Complaint, ¶¶ 8, 40-79).

### 5.  The claims against Ford and Cedar Avenue.

#### a.  Claim No. 1 – Race Discrimination under 42 USC §3604.

The Underlying Complaint alleges that Ford discriminated against Mr. Davidson in the terms, conditions or privileges of his rental of the duplex, or in the provision of services or facilities in connection with the rental, because of race, color or national origin "when he subjected Mr. Davidson to racist insults, threatened his housing, and coerced him to rub liquid on Mr. Ford's naked body." (Underlying Complaint, ¶¶ 40-44).

#### b.  Claim No. 2 – Race Discrimination under ORS 659 A.421.

This claim, made under Oregon law, alleges that "Mr. Ford interfered with Mr. Davidson's use or enjoyment of the Rental Home by intentionally discriminating against him on the basis of his race, color, or national origin and by creating or attempting to create an intimidating, hostile, or offensive environment, when he subjected Mr. Davidson to racist insults, threatened his housing, and coerced him to rub liquid on Mr. Ford's naked body." (Underlying Complaint, ¶¶ 45-48).

#### c.  Claim No. 3 – Sex Discrimination under 42 USC §3604.

Claim No. 3 alleges that Ford sexually discriminated against Ms. Davidson when "he exposed his genitals to her, harassed and bullied her, threatened her housing, and coerced her to rub liquid on his naked body." (Underlying Complaint, ¶¶ 49-53).

### d. Claim No. 4 – Sex Discrimination under ORS 659 A.421.

Claim 4. alleges that "Mr. Ford interfered with Ms. Davidson's use or enjoyment of the Rental Home by intentionally discriminating against her on the basis of sex and by creating or attempting to create an intimidating, hostile, or offensive environment, when he exposed his genitals to her, harassed and bullied her, threatened her housing, and coerced her to rub liquid on his naked body." (Underlying Complaint, ¶¶ 54-57).

### e. Claim No. 5 – Landlord Retaliation under ORS 90.385.

This claim alleges that Ford violated Oregon law by retaliating against the Davidsons by decreasing services and threatening to bring an action for possession after the Davidsons "made good faith complaints regarding the tenancy and performed or expressed intent to perform any act for the purpose of asserting, protecting or invoking the protection of any right secured to tenants under any federal, state or local law." (Underlying Complaint, ¶¶ 58-61).

### f. Claim No. 6 – Battery of Haylee Davidson and of Eric Davidson.

Claim No. 6 contains two counts – Count One for Ford's alleged battery of Ms. Davidson and Count Two for Ford's alleged battery of Mr. Davidson. The battery alleged in both counts includes that "Mr. Ford intended to and in fact caused harmful or offensive physical contact" "by way of coercion" when he allegedly threatened to raise the Davidsons' rent and threatened their housing or threatened to engage in further harassment of the Davidsons if they did not rub moonshine onto his naked back and buttocks. (Underlying Complaint, ¶¶ 62-68).

### g. Claim No. 7 – Intentional Infliction of Emotion Distress.

Claim No. 7 alleges that "Ford intentionally inflicted severe emotional distress on Plaintiffs by way of extreme and outrageous conduct when he regularly exposed his genitals to them, coerced them into rubbing his naked back and buttocks, made threats regarding their housing, interfered

with Ms. Davidson's employment, and made racist comments and otherwise harassed and bullied them, among other acts." (Underlying Complaint, ¶¶69-72).

### h. Claim No. 8 – Negligence.

Claim No. 8 alleges that "Ford breached the duties he owed to Plaintiffs as their landlord when he regularly exposed his genitals to them, coerced them into rubbing his naked back and buttocks, made threats regarding their housing, interfered with Ms. Davidson's employment, exposed his genitals to their daughter, and made racist comments and otherwise harassed and bullied them, among other acts." (Underlying Complaint, ¶¶ 73-76).

### i. Claim No. 9 – Intentional Interference with Economic Relations.

Claim No. 9 alleges that "Mr. Ford intentionally interfered with Ms. Davidson's contractual relationship with her employer when he created a hostile working environment for Ms. Davidson by harassing and bullying her, refusing to wear clothes, and coercing her into rubbing his naked body, thereby causing Ms. Davidson to lose her employment." (Underlying Complaint, ¶¶ 77-80).

## ANALYSIS

### I. Discussion.

#### A. Standards for summary judgment.

A court shall grant summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A "material" fact is one that, under the governing substantive law, is both relevant and might affect the outcome of the lawsuit. *Id.* at 248. If, under the governing law, there can be but one reasonable conclusion as to the verdict, the court must grant the motion. *Id.* at 248-251.

When the operative facts are not in dispute, the interpretation of a contract is a legal

question. Insurance policies are contracts. In Oregon, the objective theory of contracts is followed.

The Restatement (First), Contracts, § 230, p. 310, as quoted by the Oregon Supreme Court in

*Springer v. Powder Power Tool Corp.,* 220 Or. 102, 110 (1960), explains that theory as follows:

> The standards of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean.

*See also*, *Kabil Developments Corp. v. Mingot*, 279 Or. 151, 156 (1977).

**B.      Standards governing insurers' duties to defend.**

In Oregon, an "insurer has a duty to defend its insured in an action against the insured if the action involves any claim stated against the insured that could impose liability for conduct covered by the policy. . . . That duty remains even if the complaint also alleges conduct or damages that would not fall within the policy's coverage." *Fountaincourt Homeowners' Ass'n v. Fountaincourt Dev., LLC*, 360 Or. 341, 354 (2016) (c*iting, Ledford v. Gutoski*, 319 Or. 397, 399-400 (1994)).

**C.      Ford's intent is imputed to Cedar Avenue.**

As mentioned, each of the claims in the Underlying Complaint alleges vicarious liability of Cedar Avenue for Ford's actions. Although Cedar Avenue is not alleged to have acted by itself or with its own intent, because Ford is the sole owner of Cedar Avenue, his acts – all of which are alleged to have been intentional, willful and malicious – are imputed to the LLC. In the *McLeod* case, the Oregon Court of Appeals was asked to determine coverage for a company whose chief executive officer committed wrongful acts. The Court of Appeals explained that while it normally "is the insured's [the corporation's] actual conduct, not the imputed conduct of another, that determines coverage", "[a] corporation can be denied coverage because of the intentional acts of

a shareholder or officer of the corporation . . . when the shareholder or officer so dominates and controls the officers of the corporation that the corporate entity must be disregarded." *McLeod v. Tecorp Int'l, Ltd.*, 117 Or. App. 499, 502 n. 3 (1992) *reversed on other grounds*, 318 Or. 208 (1993). In *McLeod,* it was unclear from the record what percentage of stock ownership the officer had or whether he had absolute control over the company's affairs. *Id.* Therefore the officer's intent could not be imputed to the company. The Underlying Complaint here, unlike the record in *McLeod*, provides the information needed to impute Ford's intent to Cedar Avenue. Specifically, it is alleged in the Underlying Complaint that Ford was, at all times relevant, "the member-manager of Defendant Cedar Avenue LLC," (Underlying Complaint, ¶ 8) (underlining added). In a member-managed LLC, all of the members have rights of control. *See Cortez v. Nacco Material Handling Grp., Inc.*, 356 Or. 254, 274 (2014) (*citing* ORS 63.130(1)(a) as "explaining that, in member-managed LLCs, each member has equal rights in the management and conduct of the LLC's business.") Thus, Ford, as **the** member-manager is the singular owner with sole and total control over Cedar Avenue.

Ford, as **the** member-manager, with absolute control of the LLC, distinguishes the scenario completely from those in cases likely to be referenced by Ford and Cedar Avenue in their Response. *See, e.g., Am. Med. Response Northwest, Inc. v. Ace Am. Ins. Co.*, 31 F. Supp. 3d 1087 (D. Or. 2014); *North Clackamas Sch. Dist. v. Or. Sch. Bds. Ass'n Prop. & Cas. Trust*, 164 Or. App. 339 (1999); *Albertson's, Inc. v. Great Southwest Fire Ins. Co.*, 83 Or. App. 527 (1987). In none of those cases did the wrongdoer/abuser have complete control of the corporate entity as Ford is alleged to have in the Underlying Complaint.

Additionally, the Underlying Complaint calls Ford and not Cedar Avenue "Plaintiffs' landlord," (*Id.* at Introduction), and Ford is alleged to have had control over the amount that would

be owed for rent and allegedly said the "Davidsons had to get off <u>his</u> property or <u>Mr. Ford</u> would forcibly remove them." (*Id.* at ¶¶ 16-17) (underlines added), and when confronted by Mr. Davidson regarding the Ms. Heberts incident involving the Davidsons' child, Ford allegedly said that he was "threatening you [the Davidsons] living there" and "you are going to move anyway, I promise you that." Each of these allegations demonstrates that as the sole owner of the LLC, Ford owned 100 percent of the LLC and had complete control. Thus, Ford's intent and actions also are the intent and actions of Cedar Avenue. Ford cannot hide behind the corporate entity to obtain insurance for his uninsurable willful harassment of the Davidsons.

The Oregon Court of Appeals also dealt with imputed intent in *Minnesota Bond, Ltd. v. St. Paul Mercury Ins. Co.*, 72 Or. App. 187 (1985) *reversed on other grounds*, 300 Or. 85 (1985). In *Minnesota Bond*, the Oregon Court of Appeals considered a case in which an insured corporation was owned by two officers, one of whom intentionally set fire to the business in order to avoid a debt owed to the other. The court held that an arsonist's status as an officer, stockholder, employee or agent of an insured corporation does not necessarily preclude recovery by a corporate insured on an insurance policy. However, the court said, that analysis changes where the party committing the offense exercises "absolute control" over the company:

> Under the "dominant actor" method of analysis, if an officer or shareholder exercises absolute control in the conduct of the corporation's business, his actions are imputed to the corporation in the same way that the actions of one partner or coinsured are imputed to another partner or coinsured. . . . The rationale underlying the denial of recovery in such cases is that, when a corporation has relinquished control of its affairs to a single individual, it is deemed to have acquiesced in or ratified the wrongful acts of that individual.

*Minnesota Bond*, 72 Or. App. at 191. The U.S. Court of Appeals for the Ninth Circuit also has recognized the principle that where an individual controls a company, the individual's wrongful acts are also considered to be the company's wrongful acts. *California Union. Ins. Co. v. American Diversified Sav. Bank*, 948 F.2d 556, 566 ((1991) ("there is a public policy against permitting a

corporation to collect insurance for the defalcations of its alter ego"). Again, in the Underlying Complaint it was alleged that, as the member-manager, Ford was the sole owner of Cedar Avenue and there is no allegation that contradicts that he has and exercises absolute control over the conduct of the company. This was made excessively clear by the fact that Ford is alleged to have stated that he could raise or waive rent as he desired and also evict the Davidsons if they did not acquiesce to his demands for them to touch his naked body and perform other tasks on his behalf. As mentioned above, Ford allegedly threatened Mr. Davidson with eviction – "you are going to move anyway, I promise you that," and following Ms. Davidson's discussion with Ford about the Ms. Heberts incident, it is alleged that Ford "immediately" texted Mr. Davidson with a rent increase notice. As **the** member-manager with this type of control, there is no reasonable interpretation other than that Ford is the "dominant actor" of Cedar Avenue. Because Ford is the "dominant actor," Cedar Avenue is deemed to have acquiesced in and ratified Ford's wrongful acts.

> **D.** **The coverage grant is not triggered in the Rental Dwelling Policy nor is the coverage grant triggered in the Umbrella Policy for any "bodily injury" alleged in the Underlying Complaint. Cedar Avenue is not an insured under the Umbrella Policy.**

> **1.** **The Rental Dwelling Policy's Coverage Grant is not triggered.**

The Rental Dwelling Policy's Coverage L – Business Liability provides a defense when suit is brought against an insured "for damages because of 'bodily injury,' 'personal injury,' or 'property damage' to which this coverage applies, caused by an 'occurrence,' and which arises from the ownership, maintenance, or use of the 'insured premises'. . . ." (Rental Dwelling Policy, p. 15). Here, the coverage grant is not triggered because the Underlying Complaint does not allege

an "occurrence[3]." In other words, even if there is "bodily injury," "property damage" or "personal injury," the Rental Dwelling Policy is not triggered because there is no "occurrence."

The Policy defines an "occurrence," in relevant part, as "an accident, including exposure to conditions, which results in . . . 'bodily injury'. . . 'property damage;' or . . . 'personal injury' . . . during the policy period." Repeated or continuous exposure to the same general conditions is considered to be one 'occurrence'." (Rental Dwelling Policy, p. 7). Although the Rental Dwelling Policy does not define the term "accident," Oregon courts hold that "the term's meaning in liability insurance policies is well established and unambiguous." *Mutual of Enumclaw Ins. Co. v. Gutman*, 172 Or. App. 528, 534 (2001). The term "accident" "does not focus on the intentionality of [the insureds'] conduct but, rather, looks to whether they intended to cause injury to the [alleged victim]. . . . The question is whether the insured specifically intended the harm suffered or, alternatively, engaged in an act so certain to cause the particular kind of harm that the court will say that the insured intended the harm." *Id.* (internal citations omitted). Further, "Plaintiffs cannot create a duty to defend merely by labeling intentionally injurious conduct as negligence, and finding an occurrence depends on the conduct alleged rather than the labels placed on counts in a complaint alone." *Estate of Schuch v. State Farm Fire & Cas. Co.*, 552 F. Supp. 3d 1154, 1161 (D. Or. 2021) (*citing*, *L&D of Or. v. Am. States Ins. Co.*, 171 Or. App. 17, 20 (2000) (internal quotations omitted).

Here, the allegations in each claim allege that Ford (and by extension Cedar Avenue) either intended to cause the specific harm that resulted from Ford's intentional actions, or that Ford's (and by extension Cedar Avenue's) actions were so certain to result in the type of harm allegedly

---

[3] State Farm does not admit that any other requirement for coverage is met by discussing only that there is no "occurrence."

suffered by the Davidsons that the harm should be considered to be intended.

> a. **The Race and Sex Discrimination claims do not constitute an "occurrence."**

The first four claims that the Davidsons allege against Ford and Cedar Avenue are for race discrimination under 42 U.S.C. 3605 and ORS 659A.421 and sex discrimination under 42 U.S.C. 3604 and ORS 659A.421. The acts which are alleged to have constituted the race discrimination are Ford's subjecting "Mr. Davidson to racist insults, threaten[ing] his housing, and coerc[ing] him to rub liquid on Mr. Ford's naked body." (Underlying Complaint, ¶¶ 41, 46). In the state law race discrimination claim, it is explicitly alleged that Ford's discriminatory conduct, just listed, was "intentionally discriminating against him [Mr. Davidson] on the basis of his race, color, or national origin and . . . [was] creating or attempting to create an intimidating, hostile, or offensive environment." (*Id.* at ¶ 46). The sex discrimination claims similarly allege intentional actions. Specifically, it is alleged that Ford was "intentionally discriminating against her [Ms. Davidson] on the basis of sex . . . by creating or attempting to create an intimidating, hostile, or offensive environment, when he exposed his genitals to her, harassed and bullied her, threatened her housing, and coerced her to rub liquid on his naked body." (*Id.* at ¶ 55). The federal claim alleges the same conduct. (*Id.* at ¶ 50).

Intentional discrimination is not an "occurrence" under Oregon law. *Sch. Dist. v. Mission Ins. Co.,* 58 Or. App. 692, 708 (1982). In *Sch. Dist.* it was explained that there "was potential coverage [under an 'occurrence' based policy only] for claims alleging discrimination by disparate impact that do not require proof of discriminatory motive." *Id.* at 701. Although the Court of Appeals was looking at an errors and omissions policy in *Sch. Dist.*, it aptly explained that there is no negligence in a disparate treatment claim – where there is no negligence, there is no "occurrence." "Discrimination by disparate treatment means treating an individual less favorably

*because* of that individual's race, sex, color, religion, or national origin. It is the injury which must be intended. Claims of disparate treatment are not covered." *Id.* (Emphasis in original). Further, as the *Sch. Dist.* court stated, "[c]laims of harassment because of race [or comparably, because of sex] must be claims of disparate treatment. Harassment is not a facially neutral policy or practice which has merely a discriminatory impact, but a claim which, if the complainant is to prevail, **requires a showing of intent**. There is no basis for liability because of a negligent act, error or omission." *Id.* at 708. (Emphasis added).

In the Underlying Complaint, each of the allegations of race and sex discrimination is of intentional conduct. As the *Sch. Dist.* court explained, this type of discrimination requires a showing of intent to injure. An intent to injure negates an "occurrence" and there can be no coverage. Critically, there are not different actions alleged in each claim. Instead, all of the claims alleged relate to this same conduct which constitutes the basis for the discrimination claims. Because the disparate treatment claims necessarily include an alleged intent to injure, there can be no "occurrence" for any alleged injury because the same conduct and the same intent to injure always exists. Looking at the allegations confirms what the courts concluded about the disparate treatment allegations – Ford (and therefore Cedar Avenue) intended each harm alleged or the harms were so certain to result in the types of harms that occurred that they are to be deemed intended. Specifically, each time the Davidsons did not strictly follow Ford's orders, no matter how offensive Ford's orders were, he threatened to evict them or raise their rent. A landlord calling his tenants derogatory names, exposing his naked body to the tenants, threatening to raise rent or evict the tenants and forcing the tenants to touch the landlord naked is so certain to result in the tenants having emotional trauma with physical manifestations and in the tenants fleeing the situation that Ford's (and therefore Cedar Avenue's) intent must be inferred. Ford's actual intent

for the Davidsons to be forced from their home also is evident from the allegations that he demanded the Davidsons leave and that "you are going to move anyway, I promise you that." (Underlying Complaint, ¶¶ 17, 32). No damage is alleged that was not intended.

The Oregon Court of Appeals also has confirmed this. In *Groshong,* the Court of Appeals held that Oregon public policy precludes insurance coverage of claims alleging "disparate treatment" discrimination because such discrimination "necessarily implicates an intent to injure." *Groshong v. Mut. of Enumclaw Ins. Co.*, 143 Or. App. 450, 458 (1996).

And again, because Ford is alleged to be the sole member of Cedar Avenue, with "absolute control," there also is no "occurrence" regarding Cedar Avenue because Ford's intent to discriminate against the Davidsons is imputed to Cedar Avenue.

> **b.    The Landlord Retaliation claim, under ORS 90.385, does not allege an "occurrence."**

ORS 90.385 prohibits landlords from retaliating against tenants by increasing rent or decreasing services because, in relevant part, the tenant "has made any complaint to the landlord that is in good faith or related to the tenancy" or the tenant "has performed or expressed intent to perform any other act for the purpose of asserting, protecting or invoking the protection of any right secured to tenants under any federal, state or local law." While the Oregon Supreme Court has said that, to establish a claim under ORS 90.385, a tenant need not prove "that the landlord intended to cause the tenant injury in return" for the insured's protected act, *Elk Creek Mgmt. Co. v. Gilbert*, 353 Or. 565, 574 (2013), this does not mean that the landlord "retaliation" is not an intended act with an intended result, as is evident in the *Gilbert* court's analysis that "the statute is satisfied if the landlord made the decision to act *because of* the tenant's protected activity." *Id*. (Emphasis in original). While the court said that a tenant need not establish malice or hostility on the part of the landlord to trigger the statute, the fact that a landlord's decision to act in a way that

is detrimental to the tenant was made *because of* a tenant's protected actions necessarily implicates an intentional result. In other words, the landlord causes or intends to cause the injurious result in response to the tenant's act – this is an intended act and an intended result and thus is not an "occurrence."

Here, the Underlying Complaint alleges that Ford "retaliated" against the Davidsons "by decreasing services and threatening to bring an action for possession" after the Davidsons "made good faith complaints regarding the tenancy." In context, it is clear that Ford's actions were intended. For example, the "retaliation" included that:

> On April 10, 2022, when Mr. Davidson visited Mr. Ford's home to pay rent, Mr. Ford walked around his home naked and asked Mr. Davidson to rub moonshine onto Mr. Ford's back and buttocks. Mr. Davidson refused to do so. In response, Mr. Ford stated that Mr. Davidson was made for that kind of work. When Mr. Davidson said he was leaving, Mr. Ford stated that he will add $50 to Mr. Davidson's rent next month.
>
> ***
>
> On June 29, 2022, Ms. Davidson reported to work at Ms. Heberts' unit, where Mr. Ford was present and naked once again. Ms. Davidson again requested that Ms. Hebert ask Mr. Ford to put on clothes. In response, Mr. Ford became visibly agitated and did not put on clothes. Ms. Davidson told Mr. Ford that she refused to work if he did not put on clothes. In response, Mr. Ford said that Ms. Davidson would be breaching a contract if she didn't work. Mr. Ford also said that he would evict Ms. Davidson right after she came to her senses and made his "goddamn coffee."

(Underlying Complaint, ¶¶ 24, 28). These are express allegations of intentional conduct which Ford engaged in *because of* the Davidsons' complaints, and the threats and decreasing of services are alleged to have been intended acts made in retribution. The retaliation is alleged to be both the act and the result – through Ford's (and by his control, Cedar Avenue's) retaliatory acts of decreasing services and threatening to bring an action for possession, the Davidsons suffered the injuries of decreased services and being threatened with eviction. Additionally, these injuries were so certain to cause the emotional stress and eventual evacuation of the apartment by the Davidsons

(as Ford is alleged to have desired) that those additional results also were intended by Ford and Cedar Avenue. The Underlying Complaint therefore alleges intentionally harmful conduct that does not constitute an "occurrence."

        c.       **The two counts of the Battery claim do not allege an "occurrence."**

There can be no question that the counts of the Battery Claim are not covered. Each count states, "Mr. Ford intended to and in fact caused harmful or offensive physical contact . . ." with the Davidsons by coercing them, through threats, to "rub moonshine onto Mr. Ford's naked back and buttocks." (Underlying Complaint, ¶¶ 63, 66). Under Oregon law, the tort of battery requires (1) that a person act with intent to cause harmful or offensive contact with another person, and (2) those actions directly or indirectly cause a harmful or offensive contact with that other person. *Underwood v. City of Portland*, 319 Or. App. 648, 650 (2022); *see also*, *Knight v. Durbin*, 2019 U.S. Dist. LEXIS 115445, at *50-52 (D. Or.). In *Knight*, the U.S. District Court for the District of Oregon, citing decisions by the Oregon Supreme Court and the Oregon Court of Appeals, observed that battery requires "an actual intent not only to do an act but to cause personal injury," that battery is "a voluntary act that is intended to cause the resulting harmful or offensive contact." *Knight*, 2019 U.S. Dist. LEXIS 115445, at *50-52. The alleged batteries, which all occurred over the expressed denials of consent by the Davidsons, also were so certain to cause the Davidsons to have emotional stress and to "vacate[] the Rental Home to escape Mr. Ford" that all of the alleged damages must be deemed intended by Ford and thus by Cedar Avenue. (Underlying Complaint, ¶ 35). Notably, when the Davidsons initially refused to touch Mr. Ford's body, he threatened each of them in relation to their rent – these types of threats indicate a desire to have the Davidsons leave if they did not acquiesce. (*Id.* ¶¶ 20, 24).

### d. The Intentional Infliction of Emotional Distress claim does not allege an "occurrence."

It is the facts alleged in a complaint, not the labels placed on claims by an underlying plaintiff that determines coverage. *L&D of Or. v. Am. States Inc. Co.*, 171 Or. App. 17, 20 (2000). However, with some claims, such as intentional infliction of emotional distress ("IIED") claims, intentional harm is an element of the claim itself. *Mullen v. Meredith Corp.*, 271 Or. App. 698, 713 (2015) (outlining the elements of an IIED claim). Thus, to meet the requirements of the claim, it is alleged in the Underlying Complaint that "Mr. Ford intentionally inflicted severe emotional distress on Plaintiffs. . . ." (Underlying Complaint, ¶ 70). Likely, Ford (and by extension Cedar Avenue) will argue that this allegation should be disregarded because of the so-called "lesser-included" rule. The argument likely will be that the IIED claim could still trigger the duty to defend because negligent infliction of emotional distress is a lesser-included claim within IIED. *See, e.g. Ferguson v. Birmingham Fire Ins. Co.*, 254 Or. 496, 506-07 (1969). But the lesser-included rule does not trigger the duty to defend in this case. The allegations themselves allege intentional acts with intended harm. Specifically, Ford is alleged to have "regularly exposed his genitals to them, coerced them into rubbing his naked back and buttocks, made threats regarding their housing, interfered with Ms. Davidson's employment, and made racist comments and otherwise harassed and bullied them, among other acts." (Underlying Complaint, ¶ 70). The nakedness and coercion related to the alleged batteries are all alleged to have occurred with Ford knowing that the Davidsons were not willing participants in his actions. (*Id.* at ¶¶ 18-20, 24, 28). Additionally, the "other acts" included Ford exposing his genitals to the Davidsons' minor daughter and telling her that she was breaking into the neighbor's home. (*Id.* at ¶ 31). The emotional distress is so sure to follow Ford's acts that the distress must be considered to have been caused intentionally. *Drake v. Mut. of Enumclaw Ins. Co.*, 167 Or. App. 475, 482 (2000) ("Even as to claims for which an

intention to injure need not be inferred solely from the nature of the theory of recovery, the pleading itself may allege facts demonstrating an intention to injure.").

### e. The Negligence claim does not allege an "occurrence."

As outlined above, insurance coverage is determined by the facts alleged in a complaint against the insured, not by the label placed on a claim. Therefore, merely labeling Ford's conduct as negligent does not make it so and does not trigger a duty for State Farm to defend intentionally caused harms.

Here, the alleged acts which are the basis of the Negligence claim expressly state that Ford:

> Regularly exposed his genitals to [the Davidsons], coerced them into rubbing his naked back and buttocks, made threats regarding their housing, interfered with Ms. Davidson's employment [by repeatedly exposing his genitals to Ms. Davidson in her place of employment and forcing her to rub his naked body in her place of employment], exposed his genitals to their daughter, and made racist comments and otherwise harassed and bullied them, among other acts.

Nothing in these claims states an "accident" or some other misunderstanding. Instead, it is alleged that Ford repeatedly was told that his actions were unwelcome but he continued to do them anyway. Additionally, it is alleged that Ford used the most vulgar of racial slurs. These actions are of the type that necessarily are intended to cause the injuries that resulted. Importantly, Ford's alleged bullying of the Davidson family is alleged to have gone so far that he allegedly stood naked in the neighbor's doorway smoking a cigarette, and exposed his genitals to the Davidsons' seven-year-old daughter and then, instead of covering himself, he allegedly bullied the little girl by telling her that "she was breaking in."

There is no reasonable interpretation of the allegations which would allow for the understanding that Ford's actions, or the results of his actions, were accidental. Indeed, when confronted by Mr. and Ms. Davidson in relation to his conduct toward their daughter, Ford allegedly issued more threats against them, which is not consistent with the reaction of a person

who had accidentally caused harm. The same is true when confronted regarding his nakedness and requests to have the Davidsons' touch his naked body. Instead of apologizing, Ford allegedly doubled-down each time, threatened to evict the Davidsons or demanded they leave, and further bullied the Davidsons to get the results out of them that he desired.

All of the acts alleged – Ford's discrimination in housing, using racial slurs, repeatedly exposing his genitals to his tenants, coercing the Davidsons to touch his naked body, threatening eviction, telling the Davidsons to leave and otherwise bullying the Davidsons – are acts which, by their very nature, would cause harm – the type of harm that is alleged to have occurred. Where this is the case, there is no "occurrence." *See*, *Falkenstein's Meat Co. v. Md. Cas. Co.*, 91 Or. App. 276, 280 (1988) ("retaliatory and discriminatory conduct pursuant to ORS 654.062(5)(a) are acts from which an intention to cause harm must necessarily be inferred."); *Cunningham & Walsh Inc. v. Atlantic Mutual Ins.,* 88 Or. App. 251, 255 (1987), *rev. den.* 305 Or. 102 (1988) (the Oregon Court of Appeals held that "deceit, by its nature, is an act from which an intention to cause harm must necessarily be inferred, and that, when deceit is intended, it is of no consequence that the specific harm for which relief is sought is not alleged to have been intended."). There are no allegations in the Underlying Complaint that can be anything other than intentionally caused harm.

Again, because Ford is the sole owner and had full control of Cedar Avenue as the sole member-manager, there also is no negligence in relation to Cedar Avenue and thus no duty to defend.

        **f.**      **The Intentional Interference with Economic Relations claim does not allege an "occurrence."**

In this last claim, Ford is alleged to have intentionally interfered with Ms. Davidson's contractual relationship with her employer when he created a hostile working environment for

Ms. Davidson by harassing and bullying her, refusing to wear clothes, and coercing her into rubbing his naked body, thereby causing Ms. Davidson to lose her employment when her company canceled the contract with the neighbor following Ms. Davidson's complaints about Ford's actions. As with the other claims, intentional conduct and intended resulting harm is alleged. Thus, this claim does not allege any "occurrence." Further, as with the claims discussed above, no lesser-included claim could trigger a duty to defend because the acts themselves are alleged to be intentional or of the type that are so certain to cause harm that the intent is inferred.

2.   There is no "bodily injury" or "property damage" "loss" to trigger any duty to defend regarding the Umbrella Policy for Ford, and Cedar Avenue is not an insured on the Umbrella Policy.

a.   Cedar Avenue is not an insured on the Umbrella Policy.

Cedar Avenue is not an insured in relation to the Umbrella Policy. The named insured on the Umbrella Policy is "Ford, William." (Umbrella Policy, p. 1). Cedar Avenue is not an extended named insured or otherwise named on the Umbrella Policy. *Id.* This makes sense as the Umbrella Policy is a personal liability umbrella policy and Cedar Avenue is a limited liability company. Further, there is nothing in the definition of an "insured" in the Umbrella Policy that could result in Cedar Avenue being an insured. Under definition 6.c., an organization can be an insured only to the extent that it is liable for the use of an automobile, recreational motor vehicle or watercraft by a human being who qualifies as an insured under the Umbrella Policy. The Underlying Complaint contains no allegations that Cedar Avenue is liable to the Davidsons because of the use of an automobile, recreational motor vehicle or watercraft, much less the use of such vehicles or watercraft by Ford or anyone else who might qualify as an insured under the Umbrella Policy. Therefore, only Ford is an insured under the Umbrella Policy and Cedar Avenue will not be discussed further regarding the coverage of the Umbrella Policy. However, even if Cedar Avenue were an insured, the same analysis regarding total control of the LLC by Ford would apply and

coverage would be precluded for Cedar Avenue.

**b.  The coverage grant of the Umbrella Policy is not triggered for any "bodily injury" or "property damage" "loss."**

The Umbrella Policy provides a defense only when "a suit is brought against any 'insured' for damages because of a 'loss' to which this policy applies. . . ." (Umbrella Policy, p. 12). There is no "loss" related to any alleged "bodily injury" or "property damage" in this case. A "loss," as it relates to "bodily injury" or "property damage" is defined by the Umbrella Policy as "an accident, including accidental exposure to conditions, which first results in 'bodily injury' or 'property damage' during the policy period. Repeated or continuous exposure to the same general conditions is considered to be one 'loss'". (*Id.*, p. 8). Thus, to be a "loss" there must be an "accident." In relevant part, this definition is the same as the definition of an "occurrence," discussed above. Therefore, for all of the same reasons that there is no "occurrence" alleged in the Underlying Complaint, there also is no "loss" in relation to any alleged "bodily injury."

In fact, there is no "bodily injury" or "property damage" alleged, as the terms are defined in the Umbrella Policy. There is not even an argument that the Underlying Complaint alleges "property damage." Regarding "bodily injury," the Umbrella Policy's definition of "bodily injury," unlike the definition in the Rental Dwelling Policy, expressly excludes "emotional distress, mental anguish, humiliation, mental distress, mental injury or any resulting physical injury unless it arises out of actual physical injury to some person. . . ." (*Id.*, pp. 7-8).

In the Underlying Complaint, the Davidsons are not alleged to have suffered physical injury during their coerced contact with Ford where he pressured them to rub moonshine on Ford's naked back and buttocks, which is the only physical contact between Ford and the Davidsons alleged in the Underlying Complaint. Rather, the Davidsons are alleged to have incurred physical manifestations of emotional distress, such as stomachaches and sleeplessness, as well as high blood

pressure and digestive problems arising out of medications taken to manage other conditions. Because these physical manifestations do not arise out of actual physical injury, the Underlying Complaint does not allege "bodily injury" as defined by the Umbrella Policy.

**E.      Exclusions in both policies completely preclude a duty to defend both Ford and Cedar Avenue.**

      **1.      Exclusions in the Rental Dwelling Policy completely preclude coverage.**

            **a.      The Expected or Intended Injury Exclusion precludes the duty to defend under the Rental Dwelling Policy.**

The Rental Dwelling Policy's Expected or Intended Injury Exclusion, Exclusion 1.a.(1), precludes coverage, in relevant part, for "bodily injury" or "personal injury" "which is either expected or intended by an 'insured.'" (Rental Dwelling Policy, p. 15). Oregon courts analyze expected or intended injury exclusions in the same way they analyze whether there is an "occurrence." *Ledford*, 319 Or. at 401. Thus, the above analysis regarding an "occurrence" applies to the Expected or Intended Injury Exclusion, and for the same reasons there is no "occurrence" for either Ford or Cedar Avenue, the Expected or Intended Injury Exclusion applies and precludes the duty to defend either defendant.

There also is another reason why the Expected or Intended Injury Exclusion applies to preclude coverage for Cedar Avenue, even if Ford were not its sole owner with complete control. Unlike the "occurrence" analysis which focuses only on the intent of <u>the</u> insured, the language of the Exclusion precludes coverage for "bodily injury" or "personal injury" expected or intended by "<u>an</u> insured." Ford is alleged to have been "acting within the scope of his employment or actual, implied, or apparent authority at the time he committed the relevant acts" meaning that Ford is an insured under the Rental Dwelling Policy. Because Ford's actions as alleged in the Davidsons' Complaint were deliberate acts with results that were intended and/or expected by Ford, the Expected or Intended Injury Exclusion applies not just to Ford but also to Cedar Avenue.

The Exclusion's use of the indefinite article "an" has been found to preclude coverage based on the expected or intended actions of any insured, not just the insured requesting a defense (in this instance, Cedar Avenue). The Oregon Court of Appeals made this point in *Ristine* when it stated in dicta that, "Limiting an exclusion that, by its terms applies to '*an* insured' or to '*any* insured' to one – and only one – insured would seem to conflict with its wording, which employs an indefinite article." *Ristine v. Hartford Ins. Co.*, 195 Or. App. 226, 234 (2004).

The weight of authority in the U.S. District Court for the District of Oregon has followed this reading of exclusions which use indefinite articles. For example, in *Pemco Mut. Ins. Co. v. Foley*, 555 F. Supp. 3d 1028, 1033 (2021), the court found that "[t]he fact that the Policy uses the indefinite article 'an' rather than the definite article 'the'" supported the conclusion that "an insured" has a plural context and refers to all insureds. Similarly, in *Kirk*, the court rejected an argument that "an insured" should be interpreted differently from "any insured" and held that a policy provision applied to all insureds when the term "an insured" is used. *Kirk v. Mut. of Enumclaw Ins.*, 2019 U.S. Dist. LEXIS 127704 at *9 (D. Or.).

The *Kirk* court said that it was persuaded by the insurer's citations to cases from other jurisdictions that had analyzed the same issue. *See*, *e.g.*, *Thoele v. Aetna Cas. & Sur.*, 39 F.3d 724, 727 (7th Cir. 1994) ("exclusions for the intentional or dishonest acts of 'an' or 'any' insured operate to bar coverage for all insureds when one of them commits such an act"); *see also*, *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 660-61(1989) ("We also hold that 'an insured' unambiguously refers to 'all' or 'any' insureds under the homeowner's policy."); *see also*, *Johnson v. Allstate Ins. Co.*, 1997 ME 3, 687 A2d 642, 644 (Supreme Judicial Court of Maine) ("[W]e hold that by excluding coverage for damages intentionally caused by 'an insured person,' Allstate unambiguously excluded coverage for damages intentionally caused by any insured person under

the policy. 'An' is an indefinite article routinely used in the sense of 'any' in referring to more than one individual object."). *But see Wakeman v. Eagle W. Ins. Co.,* 2022 U.S. Dist. LEXIS 155918, at *14-15 (D. Or.) (Distinguishing *Ristine* because the exclusion in *Ristine* was based on sexual molestation and did not say it had to be committed by any specific individual and therefore, the court said, the severability clause made the exclusion ambiguous). Respectfully, the opinion in *Wakeman*, appears to misunderstand the ruling by the Oregon Court of Appeals in *Ristine*. Specifically, the *Ristine* court explained that severability clauses merely mean what they say – the policy applies separately to each insured. *Ristine,* 195 Or. App. 233. "There is nothing in the wording of the severability provision itself that remotely suggests that it affects the substance of any provisions concerning coverage or exclusions." *Id.* Thus, the Court of Appeals said, "[a]s the Supreme Court has instructed, in construing the terms of an insurance policy, we are to give the wording of the policy its natural meaning and not attribute 'unlikely meanings to the terms employed without some basis in the policy for doing so.'" *Id. citing Western Fire Insurance Co. v. Wallis*, 289 Ore. 303, 308, 613 P.2d 36 (1980). Again, according to the Court of Appeals, it would be against a "natural meaning" reading of the term "an insured," to limit "an exclusion that, by its terms applies to '*an* insured' or to '*any* insured' to one – and only one – a insured [because that] would seem to conflict with its wording, which employs an indefinite article." *Id.* at 234.

Thus, based on the *Ristine* analysis, as long as Ford expected or intended the injuries to the Davidsons, there also is no coverage for Cedar Avenue.

      **b.**      **The Willful and Malicious Acts Exclusion precludes the duty to defend either insured under the Rental Dwelling Policy.**

Where the analyses to determine whether there is an "occurrence" and whether the Expected or Intended Injury Exclusion applies focus on whether the <u>injury</u> was intended, the Willful and Malicious Acts Exclusion, Exclusion 1.a.(2), instead focuses on an insured's intent to

act. In other words, the Willful and Malicious Acts Exclusion does not turn on whether the insured had an intent to cause a specific result. The Willful and Malicious Acts Exclusion precludes coverage, in relevant part, for "bodily injury" or "personal injury" "to any person . . . which is the result of willful and malicious acts of an insured." (Rental Dwelling Policy, p. 15). Thus, the insured can have absolutely no intent to harm the person who actually was injured, or the harm intended can be completely different from that which occurs, and the Exclusion still applies because of an insured's willful and malicious intent to act.

The U.S. District Court for the District of Oregon has reviewed the Willful and Malicious Acts Exclusion and held that "'willful and malicious' means an act done both deliberately and with intent to harm another." *Estate of Schuch v. State Farm Fire & Cas. Co.*, 552 F. Supp. 3d 1154, 1165 (2021). Importantly, as already mentioned, the court held that the Exclusion does not require that an insured intended the *particular* harm that resulted or that the intent to harm be to the person eventually harmed, only that the insured acted intentionally to cause any harm. The Ninth Circuit Court of Appeals likewise has held that "[u]nlike the 'intended or expected injury' exclusions, the 'willful and malicious acts' exclusions focus on the insured's conduct, not the resulting injury." *Wigton v. State Farm Fire And Cas. Co.*, 2022 U.S. App. LEXIS 35273 at *3. See also, *Hall v. State Farm Fire & Cas. Co.*, 109 Wash. App. 614, 620 (2001) ("the willful and malicious acts exclusions at issue here do not require an intent to injure. If they did, they would be superfluous, since the policies contain separate exclusions for injuries 'expected or intended' by an insured. . . . Thus, for the willful and malicious acts exclusions to have any meaning, they must apply to some unintended and accidental injuries.")

Therefore, whether or not Ford/Cedar Avenue had particular intent to cause the Davidsons to lose sleep or suffer other emotional damages, to cause Ms. Davidson to lose her job, to cause

the Davidsons to flee from their home, or any particular other harm is irrelevant to the Exclusion's applicability. What is important is that Ford is alleged to have deliberately used racial slurs, to have repeatedly and deliberately made threats of eviction and increased rent, to have deliberately exposed his naked body to unwilling individuals, to have deliberately physically battered the Davidsons and to have deliberately intimidated and threatened the Davidsons and their young daughter. There is no reasonable interpretation of the actions alleged in which Ford did not act deliberately and with an intent to cause *some* harm to *someone*.

Further, as with the Expected or Intended Injury Exclusion, the Willful and Malicious Acts Exclusion applies if the act is performed by "an insured." Therefore, in addition to the total control/"dominant actor" analysis, which precludes coverage for Cedar Avenue because its sole member-manager acted willfully and maliciously, there also is no coverage for Cedar Avenue because Ford, "an insured," acted willfully and maliciously. Therefore, there is no coverage for either Ford or Cedar Avenue due to this Exclusion.

> c. **The exclusion in the Rental Dwelling Policy for "personal injury" caused by a violation of penal law or ordinance precludes coverage for all allegations of Sex Discrimination, Race Discrimination and Landlord Retaliation.**

The Rental Dwelling Policy's Exclusion 2.f. precludes coverage for "'personal injury' caused by violation of a penal law or ordinance committed by or with the knowledge or consent of any 'insured.'" (Rental Dwelling Policy, p. 17). "Penal law" refers to offenses under the criminal code, i.e., laws enacted by a legislature that define conduct constituting crimes punishable by fine or imprisonment or both. An "ordinance," on the other hand, while it concerns conduct regulated by government, is not a criminal law. Any "personal injury" alleged to have been caused by the alleged violations of the Anti-Discrimination laws and the Residential Landlord and Tenant Act fall within this Exclusion. Further, because the Exclusion uses the phrase "any insured" instead of

"the insured," it will apply to both Ford and Cedar Avenue.

> ## 2. Exclusions in the Umbrella Policy preclude a duty to defend Ford – the only insured under the Umbrella Policy.

> ### a. The Harassment, Molestation or Discrimination Exclusion precludes the duty to defend regarding Ford.

The Umbrella Policy's Exclusion 3. precludes coverage for any "loss" arising out of alleged or actual "a. sexual harassment; b. sexual molestation; or c. discrimination prohibited by law; by the 'insured.'" (Umbrella Policy, p. 13). Ford's alleged actions all fall within this Exclusion. The alleged exposing of Ford's genitals and forcing the Davidsons to rub Ford's naked body is alleged to be both sexual harassment and discrimination prohibited by law. Also, the intimidation, racial slurs, interference with Ms. Davidson's employment and threats all are alleged to be discrimination prohibited by law. Therefore, if the Underlying Complaint alleges any "bodily injury" or "personal injury," it all arises out of legally prohibited sexual harassment, sex discrimination and race discrimination. An objective reading of the Underlying Complaint's allegations is that any alleged injury "arose out of" Ford's alleged sexual harassment and discrimination, and that all of his actions had a discriminatory result. The phrase "arising out of" is very broad under Oregon law and there is no reasonable reading that the alleged injuries do not arise out of the precluded actions. *See Ristine*, 195 Or. App. at 231 ("the term 'arising out of' as used in insurance policies generally is understood broadly to mean 'flowing from' or 'having its origin in,' thereby indicating that there need be 'a' causal connection, rather than a proximate causal connection.") (internal citation omitted).

> ### b. The Business Pursuits Exclusion precludes the duty to defend regarding Ford.

The Umbrella Policy's Exclusion 6., in relevant part, precludes coverage of a "'loss' arising out of any 'insured's' 'business property' or 'business' pursuits of any 'insured,' unless,"

in relevant part, "'required underlying insurance' applies to the 'loss' and provides coverage that pays for the 'loss' in the amount shown as Minimum Underlying Limits on the declarations page. . . ." (Umbrella Policy, p. 13). As Ford is the only insured under the Umbrella Policy, the Exclusion applies if there is any alleged "bodily injury" or "personal injury" that arose out of his "business" or "business property." The Umbrella Policy defines "business" as "a trade, profession or occupation," and defines "business property," in relevant part, as "premises that: a. a business is conducted on or from; [or] b. is rented to others or held for rental, in whole or in part. . . ." (Umbrella Policy, p. 8). Because Ford's interaction with the Davidsons derived solely from their tenancy in the duplex, which the Complaint alleges was rented to them by Ford and managed by Ford, any alleged "bodily injury" or "personal injury" certainly arose out of Ford's management of the duplex and conduct as the Davidsons' landlord, and therefore arose out of his trade or occupation.

Additionally, each claim within the Underlying Complaint states that Ford "was acting within the scope of his employment or actual, implied, or apparent authority" when he committed the alleged wrongful acts. (Underlying Complaint, ¶¶ 43, 47, 52, 56, 60, 64, 67, 71, 75, 79). This means that the Underlying Complaint alleges that any "loss" arose out of Ford's "business" pursuits.

Thus, the Exclusion applies unless the Umbrella Policy's required underlying insurance provides coverage for Ford. For all of the reasons stated above, the Rental Dwelling Policy does not provide coverage to Ford and therefore the "underlying insurance" exception to the Business Pursuits Exclusion does not apply. Therefore, the Business Pursuits Exclusion entirely precludes the duty to defend Ford under the Umbrella Policy.

### c. The Specific Intent to Cause Harm Exclusion and the Expected or Intended Injury/Willful and Malicious Acts Exclusions, together, preclude the duty to defend Ford.

The Umbrella Policy's Exclusion 17. precludes coverage for "'personal injury' when the 'insured' acts with specific intent to cause <u>any</u> harm." (Umbrella Policy, p. 15) (underline added). "Personal injury" includes "injury other than 'bodily injury' arising out of . . . wrongful eviction." (*Id.*, p. 8). No wrongful eviction is alleged, but even if it were, the injury would be precluded because the only reasonable interpretation of the Underlying Complaint's allegations is that Ford intended to cause some type of harm by each of his actions. Moreover, Ford repeatedly threatened to evict the Davidsons and stated numerous times that he did not want them in his property. Thus, the Davidsons leaving the duplex was exactly what Ford said he wanted, although the Exclusion would apply even if the Davidsons' vacating of the duplex was not the result Ford really was seeking.

It is highly significant that the Exclusion applies when the insured intends to cause **any** harm. Like with the Expected or Intended Injury Exclusion and the Willful and Malicious Acts Exclusion discussed above, the use of the word "any" is significant. Again, Ford did not have to intend the exact harm that occurred and even if Ford would not have followed up on his threats to forcibly evict the Davidsons' from the duplex, the Complaint alleges that Ford's outrageous, abrasive, harassing, and discriminatory conduct was intended to intimidate and oppress the Davidsons and cause them to experience fear and distress, and that the desire to escape Ford's intentional conduct led the Davidsons to vacate the premises. Thus, a duty to defend the only potential 'personal injury' – wrongful eviction – is precluded because Ford is alleged to have acted with the specific intent to cause harm to the Davidsons in a variety of ways, and because Ford's acts that were intended to cause harm to the Davidsons led to any alleged wrongful eviction.

Additionally, as discussed above, no "bodily injury," as that term is defined in the Umbrella

Policy, is alleged in the Underlying Complaint. However, if the Underlying Complaint did allege any "bodily injury" under the Umbrella Policy's definition, coverage for the "bodily injury" would be precluded by the Expected or Intended Injury Exclusion and the Willful and Malicious Act Exclusion.

Exclusions 14.a., the Expected or Intended Injury Exclusion, and 14.b., the Willful and Malicious Act Exclusion, would preclude the duty to defend Ford regarding any alleged "bodily injury" for the same reasons discussed above. (Umbrella Policy, p. 15). Therefore, if any "bodily injury" as defined by the Umbrella Policy were alleged in the Underlying Complaint, which it is not, both the Expected or Intended Injury Exclusion and the Willful and Malicious Act Exclusion would preclude the duty to defend Ford regarding the "bodily injury."

## II. Conclusion.

For the reasons stated above, in any response State Farm may file to a Motion for Summary Judgment filed by Ford and/or Cedar Avenue, in State Farm's Reply Brief, and that may be presented at any oral argument, there is no coverage under either the Rental Dwelling Policy or the Umbrella Policy and State Farm's Motion for Partial Summary Judgment regarding the duty to defend should be granted and State Farm should be allowed to immediately withdraw from the defense.

/ / /

DATED this 14th day of September, 2023.

THE CHARTWELL LAW OFFICES, LLP

By /s/ David P. Rossmiller
**David P. Rossmiller, OSB No. 983395**
Email: drossmiller@chartwelllaw.com
**Elissa M. Boyd, OSB No. 111679**
Email: eboyd@chartwelllaw.com
**Sean W. Carney, OSB No. 054550**
Email: scarney@chartwelllaw.com
The Chartwell Law Offices, LLP
1050 SW 6th Avenue, Suite 1100
Portland, OR 97204
Telephone:    (503) 886-8108
Facsimile:    (503) 961-7864
*Attorneys for Plaintiff State Farm Fire*
*and Casualty Company*